NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 19, 2013
Decided January 17, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-3665

| | |
|---|---|
| MARY L. OLSEN, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Indiana, Hammond Division. |
| *v.* | |
| | No. 2:11-CV-189 JVB |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | Joseph S. Van Bokkelen, |
| *Defendant-Appellee.* | *Judge.* |

**O R D E R**

Mary Olsen is 44 years old and suffers from degenerative disc disease and carpal tunnel syndrome. The Social Security Administration denied her application for disability insurance benefits, and the district court upheld that determination. Olsen appeals, challenging the administrative law judge's conclusions that she exaggerated the intensity and persistence of her symptoms and that as of her date last insured, she had the residual functional capacity ("RFC") to perform medium work. Underlying both contentions is Olsen's insistence that the ALJ mischaracterized the medical evidence. Although this appeal would be simpler if the ALJ had done a better job of

explaining her conclusion that repetitive diagnostic tests showed only mild abnormalities, Olsen has made no effort to establish that the ALJ's conclusion is incorrect or is contradicted by the opinion of a medical professional. The ALJ's credibility finding is not patently wrong, and substantial evidence supports her RFC determination. Accordingly, we affirm the district court's judgment.

## I. Background

Olsen applied for disability insurance benefits in 2007 with the assistance of an attorney, alleging an onset date of April 10, 2004. Degenerative disc disease is the only impairment she initially alleged. The Social Security Administration denied Olsen's application first in November 2007 and again on reconsideration in February 2008. Olsen then requested a hearing before an ALJ. Her date last insured was December 31, 2009. The administrative record includes extensive medical documentation of Olsen's treatment history, and the following facts are drawn from that record.

Olsen initially said that she quit her job as a cosmetologist after injuring her back in April 2004. (She later stated that she quit her job in 2002—two years before her alleged onset date—and yet also admitted that even in 2008 she was performing a few haircuts and colors per week for extra money.) At the time she allegedly quit her job, she had been working as a cosmetologist for 20 years. In August 2004 Olsen saw a neurosurgeon, Dr. Leonard Cerullo, and reported having experienced back pain since she was a teenager. A lumbar MRI showed that she had a herniated disc and degenerative disc disease. Dr. Cerullo recommended physical therapy and epidural steroid injections.

Olsen did not follow Dr. Cerullo's advice. Instead, that same month she consulted an internist, Dr. Nirmala Murugavel, who also recommended physical therapy. Olsen began physical therapy, and the therapist noted that her posture and strength were good and her sensation, reflexes, and gait were normal. A few weeks later, the physical therapist reported that Olsen had met her short-term goals but would benefit from additional therapy. Olsen continued with the therapy and in 2005 began visiting a chiropractor for treatment of her shoulders, hips, and knees.

In September 2006 Olsen met with Dr. Anton Thompkins, an orthopedic surgeon, complaining of pain in her back and legs. At that time she told Dr. Thompkins that she

was taking ibuprofen and Lexapro, an antidepressant. A lumbar MRI disclosed a disc herniation and degenerative disc disease. Olsen continued physical therapy, and the therapist reported that her symptoms and endurance had improved from October to December 2006, giving her good mobility. In December 2006 Dr. Thompkins confirmed Olsen's improvement and ordered additional physical therapy.

In March 2007 Olsen returned to Dr. Thompkins reporting joint pain, which he attributed to arthritis not requiring aggressive treatment. In July Olsen consulted another orthopedic surgeon, Dr. Patrick Sweeney, complaining of back pain. Dr. Sweeney ordered a third lumbar MRI, which showed bulging discs and one herniated disc. Dr. Sweeney referred Olsen to a pain-management specialist, Dr. Ramesh Kanuru. Olsen reported to Dr. Kanuru that she was taking ibuprofen and Lexapro. Dr. Kanuru observed that Olsen walked without difficulty, demonstrated good strength and reflexes, and evidenced no tenderness in the lumbar area. He administered epidural steroid injections that, Olsen confirmed, helped ease her pain.

Olsen then applied for benefits in September 2007, claiming to have limited mobility caused by back pain but making no mention of pain in her wrists and hands or depression. She continued to complain of pain to Dr. Sweeney, and in October he ordered a cervical MRI that showed a bulging disc. Based on the results, Dr. Sweeney recommended only physical therapy. A few days later, a state-agency physician, Dr. J. V. Corcoran, reviewed Olsen's medical records to assess her RFC and concluded that she could sit, stand, or walk for about six hours in an eight-hour workday. He noted that Olsen showed no manipulative, visual, communicative, or environmental limitations. Based on the medical evidence, Dr. Corcoran concluded that Olsen was exaggerating the severity of her condition and restrictions. Her application for benefits was denied in November 2007, and she requested reconsideration.

Meanwhile, Olsen continued with physical therapy, and in December 2007 the therapist noted that her symptoms had improved. In January and February 2008, the therapist described Olsen's mobility as good and opined that her pain was limited to a level at which she was capable of working. The therapist noted that Olsen appeared to be suffering from carpal tunnel syndrome, and so Olsen again visited Dr. Kanuru. Olsen then submitted a "Disability Report" to the Social Security Administration identifying carpal tunnel syndrome as an additional impairment. She stated that she had suffered impaired use of her hands beginning in September 2007 (the same month that she applied for benefits without mentioning impairments related to her wrists or hands).

The Social Security Administration asked Olsen to complete an "Activities of Daily Living" form in February 2008, and Olsen reported that she was performing two or three haircuts or colors per week for extra money. The day after signing that form, Olsen visited Dr. Kanuru complaining of wrist pain and reported that the pain prevented her from cutting hair for a living. Dr. Kanuru observed at that time that Olsen's reflexes and sensation appeared normal, and that she had no difficulty walking. Testing confirmed carpal tunnel syndrome in Olsen's wrists.

Later in February 2008, another state-agency physician, Dr. B. Whitley, reviewed Olsen's file and endorsed the RFC determination made by Dr. Corcoran in October 2007. Olsen's request for reconsideration then was denied.

In April 2008 the physical therapist who had been treating Olsen completed an RFC questionnaire. The source of this questionnaire is not explained in the record. In contrast with the favorable progress notes the physical therapist had written during January and February of that year, she now opined that Olsen could not stand for more than two hours or sit for more than four hours in an eight-hour workday. She further opined that Olsen's mobility was so restricted that three or four unscheduled, 10- to 15-minute breaks would be required during a workday. The therapist did not explain this apparent turnaround. She did note, however, that Olsen did not have any significant limitation with reaching, handling, or fingering.

Two weeks later Olsen again visited Dr. Sweeney complaining of pain and then returned to Dr. Kanuru for another round of epidural steroid injections. Olsen then visited a third orthopedic surgeon, Dr. Joseph Schwartz, about the carpal tunnel syndrome and reported that she had been suffering numbness and weakness in her hands for 12 years (meaning that the symptoms had been present throughout much of her cosmetology career). Olsen underwent carpal tunnel release surgery on her left wrist in May 2008, which included the removal of a ganglion cyst. She continued to complain of back pain, and so Dr. Kanuru administered further injections in September 2008. At the time he noted that Olsen was taking ibuprofen and Lexapro. He also noted that Olsen had no difficulty walking and continued to have full strength in her lower extremities.

In December 2008 Olsen's chiropractor noted that she was improving and had normal range of motion despite some muscle tightness. Yet several weeks later, in January 2009, Olsen returned to Dr. Kanuru complaining of pain in her neck, shoulders, and back. The physician observed that she also appeared to be experiencing decreased

sensation in her heels and left foot. Olsen explained, though, that she was taking only ibuprofen for her pain, and that the most recent epidural steroid injections had provided 80% pain relief which lasted for several months. Dr. Kanuru administered more injections.

Olsen then visited Dr. Sweeney in April 2009 complaining of muscle spasms in her back. She asserted that the January 2009 injections had not offered the same duration of relief as previous injections. She returned to Dr. Sweeney a week later and reported that she still was in some pain but was feeling better. Dr. Sweeney ordered another lumbar MRI, which showed disc herniation but no significant change since the last imaging in July 2007. In the cervical region, the MRI revealed a small disc herniation.

Olsen received additional injections from Dr. Kanuru in May 2009. From then until January 2010, she made several visits to her chiropractor complaining of back pain. In February 2010 Olsen also visited her primary-care physician, Dr. Cynthia Yu-Fleming, and reported injuring her back while bending over. Olsen then consulted Dr. Kanuru and told him she had radiating back pain that she rated as 7 on a scale of 10 and neck pain that she rated as 6 on that scale. She also told Dr. Kanuru that she was taking Vicodin for pain and the muscle relaxer Zanaflex; the record does not disclose who prescribed these medications or when. Dr. Kanuru observed tenderness in Olsen's lumbar muscles, but that she had no difficulty walking. Olsen explained that the May 2009 injections had provided 60 to 70% relief for seven to eight months, and Dr. Kanuru concluded that continued injections would be the best course of treatment.

On April 20, 2010 (the same day as Olsen's hearing before the ALJ), Dr. Kanuru completed a brief form reporting that Olsen suffered from chronic pain syndrome. The source of that form is not explained in the record. By checking or circling preprinted answers on this form, Dr. Kanuru noted that Olsen's pain had caused marked difficulty completing daily activities and maintaining social function, as well as sleep disturbances, crying spells, suicidal thoughts, and a pervasive loss of interest in most activities. Dr. Kanuru also circled "present" next to an assertion on the form that Olsen's pain made it difficult for her to concentrate and "complete tasks in a timely manner (in work settings or elsewhere)." The physician explained in a handwritten note, however, that Olsen herself had provided the information for the form during a phone conversation. None of the limitations listed in this form are mentioned in any of Dr. Kanuru's progress notes before this date.

At her hearing Olsen testified that she continues to suffer radiating, stabbing, and aching pain. She conceded that the epidural steroid injections shorten the duration of her muscle spasms, but otherwise, she said, the injections and prescription pain medication provide only moderate relief. Olsen insisted that 10 minutes of walking causes her legs, hips, and back to feel as though they are on fire. She said she can tolerate 20 to 30 minutes of continuous standing or 20 to 45 minutes of sitting. When asked to describe any difficulty moving her hands, Olsen stated that she drops objects frequently because most days her hands and arms are numb. She explained that she has difficulty picking up objects such as coins, eyeglasses, cups, utensils, and pots. When the ALJ inquired about her daily activities, Olsen answered that she occasionally cooks, reads, vacuums, watches television, and shops for groceries. Olsen's lawyer asked if the ganglion cyst in her left wrist had regrown. Olsen said it had and was causing radiating pain in her wrist. But she did not say if any physician had confirmed the presence of a ganglion cyst or her conclusion that it was causing her pain. Olsen implied that the presence of the ganglion cyst meant that the carpal tunnel syndrome had returned in her left wrist, but nothing in her medical record suggests the two conditions are related. Olsen explained that the carpal tunnel in her right wrist had worsened and that her right hand, like her left, is now constantly numb. In the past, Olsen added, she had experienced only intermittent numbness in her hands. She estimated that she can use her hands only 45 to 60 minutes each day and must lie down two to three hours daily.

The ALJ then posed hypothetical questions to vocational expert ("VE") Thomas Grzesik. He confirmed that a person of Olsen's age, education, and work experience with an RFC for medium work could be employed as a cosmetologist or hairdresser, which is light work. He also explained that a person in Olsen's position could perform other jobs available in Chicago or northwest Indiana. When the ALJ restricted this hypothetical person to sedentary positions that allow for alternating between sitting and standing, the VE testified that competitive work still could be sustained. He conceded, however, that competitive employment is unavailable for a person who must take three to four breaks each day, is likely to miss more than four workdays per month, and must shift throughout the day between sitting, standing, and walking. When Olsen's lawyer asked the VE if the jobs he described would be appropriate for a person with limited use of her hands who constantly drops things, he said, "No."

The ALJ concluded that Olsen was not disabled on her date last insured. At Step 1 of the 5-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ found that Olsen had not engaged in substantial gainful activity during the period between her alleged onset date and date last insured. At Step 2 the ALJ found that Olsen suffers from degenerative

disc disease and carpal tunnel syndrome. At Step 3 the ALJ concluded that these impairments, although severe, do not meet or medically equal a listed impairment.

Based on Dr. Corcoran's assessment, the ALJ found that Olsen had the RFC to perform medium work, *see id.* § 404.1567(c), and could occasionally climb ladders, ropes, or scaffolds and frequently use her hands for handling, feeling, and fingering. The ALJ reasoned that the opinions of the state-agency physicians, in contrast with Dr. Kanuru's opinion, are based on the medical evidence. The ALJ summarized the evidence and discounted Olsen's assertion of disabling pain given her medical history and treatment, her ability to complete daily tasks, and the ALJ's observations of Olsen during the hearing. The ALJ gave little weight to the physical therapist's opinion from April 2008, noting that it contradicts her earlier notes.

At Step 4 the ALJ concluded that Olsen was able to perform her past work as a cosmetologist or hairdresser. And at Step 5 the ALJ determined that other jobs exist that Olsen could perform given her RFC, age, education, and work experience. The ALJ accordingly concluded that Olsen had not proved she is disabled. The district court upheld the ALJ's decision and Olsen then filed his appeal.

## II. Discussion

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Olsen first asserts that the ALJ mischaracterized the evidence as showing only mild impairments and conservative treatment. According to Olsen, the ALJ "played doctor" by substituting her own opinion when she stated that the MRIs showed mostly mild abnormalities. The cases in which we have concluded that an ALJ "played doctor" are ones in which the ALJ ignored relevant evidence and substituted her own judgment. *Compare Myles v. Astrue*, 582 F.3d 672, 677–78 (7th Cir. 2009) (reversing because ALJ drew his own inferences from medical record without evidentiary support), *Boiles v. Barnhart*, 395 F.3d 421, 425–26 (7th Cir. 2005) (reversing because ALJ ignored relevant evidence in concluding that claimant had not presented evidence showing that seizures affected her functioning), *and Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (reversing because ALJ rejected physician's opinion that claimant had arthritis without citing

conflicting evidence in record), *with Pepper v. Colvin*, 712 F.3d 351, 366–67 (7th Cir. 2013) (concluding that ALJ did not substitute own judgment for that of medical professional when he considered all relevant evidence and factors), *and Dixon v. Massanari*, 270 F.3d 1171, 1177–78 (7th Cir. 2001) (concluding that ALJ did not "play doctor" where she thoroughly discussed the medical evidence).

The ALJ did not ignore relevant evidence and substitute her own judgment here. To the contrary, the ALJ summarized the results of each MRI and drew a conclusion from those diagnostic tests that Olsen's abnormalities mostly were mild. The ALJ's discussion, unfortunately, is rife with undefined medical jargon, so her conclusion is not as transparent as it could be. But Olsen has not made a serious effort to show that the ALJ's conclusion is *incorrect*. It was Olsen's burden to present medical evidence supporting her claim of disability. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). But she never provided an opinion from a physician about the conclusion to be drawn from the various MRIs. The neurosurgeon and two orthopedic surgeons who ordered the MRIs recommended only physical therapy after reviewing the test results, and neither specialist declared Olsen unable to work. Even now Olsen does not point to any medical source showing that the ALJ misconstrued the MRIs. And simply quoting a portion of an almost indecipherable MRI report cannot satisfy Olsen's burden to show that the ALJ's decision is not supported by substantial evidence.

Olsen also challenges the ALJ's assertion that her treatment regimen was "conservative." The ALJ referred to Olsen's testimony that she saw Dr. Kanuru only once every six to eight months and Dr. Sweeney only once a year. More significantly, the epidural steroid injections were the most invasive treatment Olsen received for her back pain, and those injections have been characterized as "conservative treatment." *See Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir. 2000). Further, at least one of the orthopedic surgeons who treated Olsen deemed those injections to be "conservative." Olsen cites nothing to the contrary. The ALJ's statement that Olsen's treatment was "conservative" is not a mischaracterization of the record and is supported by substantial evidence.

Olsen next challenges the ALJ's credibility determination because, Olsen says, that assessment rests on a mischaracterization of the medical evidence, her daily activities, and the ALJ's observations during the hearing. But as noted already, Olsen has not undermined the ALJ's conclusions that her MRIs showed only mild abnormalities and that the resulting treatment was conservative. Moreover, it was appropriate for the ALJ to consider Olsen's daily activities. *See* 20 C.F.R. § 404.1529(c); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th

Cir. 2009); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). And it was appropriate for the ALJ to consider her actions during the administrative hearing. *See Powers*, 207 F.3d at 436; *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000). The ALJ correctly compared Olsen's daily activities (which included cooking, reading, shopping for groceries, watching television, and vacuuming) to her testimony that she has a very limited ability to sit, stand, and walk and concluded that Olsen was not credible as to the intensity and persistence of her symptoms. *See* 20 C.F.R. § 404.1529(c)(3). Olsen did not say that she shopped, cooked, and vacuumed only because there was no one else in the household to perform those chores.

Further, the ALJ's observations made during the hearing concerned the severity of Olsen's impairments and were appropriate because Olsen had asserted that the effects of her carpal tunnel syndrome and the purported ganglion cyst in her left wrist were so severe as to prevent her from working. *See Kelley*, 890 F.2d at 964; *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). Olsen testified that although previously she experienced only intermittent numbness in her hands, her condition had worsened, causing her hands to be constantly numb. Because of the numbness, Olsen said, she "drops everything" and has difficulty picking up objects. The ALJ's observations that she was able to hold a water bottle with her left hand and effortlessly twist off the cap with her right hand, pick up the bottle and drink from it without dropping it, grab tissues with her right hand, and grasp a chair with both hands to push herself up directly relate to Olsen's credibility regarding the severity of her impairment and were proper. *See Kelley*, 890 F.2d at 964. Because the ALJ explained that her credibility determination was based on her evaluation of the medical evidence, Olsen's daily activities, and her observations of Olsen, it is not patently wrong.

Olsen last contends that the RFC determination is erroneous because the ALJ mishandled the medical evidence and her complaints of pain. This contention mostly recycles Olsen's other appellate claims. Although Olsen adds that the ALJ failed to adequately explain her conclusion that the physical therapist's April 2008 opinion contradicts her earlier notes, the ALJ was correct to give the opinion little weight. The physical therapist observed in January and February of 2008 that Olsen's mobility was good and that the therapy had reduced "her symptoms to a level where she is capable of working." But just two months later, the therapist completed the RFC questionnaire and provided conflicting information. It is not clear whether the therapist's responses to the questions were based on her observations or based on what Olsen told the therapist. The therapist reported that Olsen had restricted mobility and suffered pain that sometimes confined her to bed and frequently interfered with the attention and

concentration needed to perform work tasks. The therapist noted that Olsen could continuously sit for only 45 minutes and stand for 30. She also stated that Olsen would have to take 3 or 4 unscheduled breaks per workday for 10 to 15 minutes each.

The therapist offered no explanation for Olsen's purported change in mobility, the restrictions on sitting and standing, or the unscheduled breaks that, according to the VE, would eliminate opportunities for employment. The ALJ needed only to minimally articulate her reason for rejecting the therapist's opinion, and substantial evidence supports the ALJ's conclusion that the opinion is not entitled to controlling weight. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Dixon*, 270 F.3d at 1177.

Additionally, substantial evidence supports the ALJ's decision to discount the form completed by Dr. Kanuru because he did not form his answers based on the medical evidence but instead parroted assertions of pain and limitations that Olsen phoned in on the day of her hearing (and after her insured status had expired). *See* 20 C.F.R. § 404.1527(c)(3); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (explaining that ALJ may discount medical opinions that are based solely on claimant's subjective complaints); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (same); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (stating that ALJ should rely on medical opinions based on objective observations and not those based on claimant's subjective complaints). Dr. Kanuru's conclusions were inconsistent with the views of the state-agency physicians (who formed their opinions based on the medical evidence), and the ALJ was allowed to discount Dr. Kanuru's opinion. *See Schmidt*, 496 F.3d at 842.

We note in closing, however, that the ALJ's conclusion that Olsen is able to occasionally climb scaffolding and ropes is mystifying and irrelevant to the RFC determination. Neither cosmetology work nor any of the other positions noted by the VE require the ability to climb scaffolding or ropes.

The district court's judgment is **AFFIRMED**.