In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1802

REBECCA ANN AKIN,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:15-cv-01380-WCG — **William C. Griesbach**, *Chief Judge.*

ARGUED JANUARY 24, 2018 — DECIDED APRIL 4, 2018

Before BAUER, KANNE, and BARRETT, *Circuit Judges.*

PER CURIAM. Rebecca Akin, a 47-year-old woman, chal-
lenges the denial of her application for Supplemental Security
Income. She contends that she became disabled in 2011 prin-
cipally from fibromyalgia, back and neck pain, and head-
aches. Akin argues that the administrative law judge made
several errors: The ALJ (1) wrongly discounted her allegations
of back pain; (2) improperly credited the opinions of agency

physicians who had not reviewed all of the medical records, including relevant MRI scans; and (3) ignored her complaints of headaches. These arguments are persuasive, so we remand.

Akin began to see Dr. Ahmad Haffar in early 2011 for gradually worsening and unresolved pain. He noted that Akin had "symptoms of fibromyalgia" and had 12 positive trigger points. An x-ray of Akin's back confirmed two fused disks, narrowed spacing, and minimal spurring. Akin complained at a follow-up appointment with Dr. Haffar in April 2011 of headaches and neck pain. She tried physical therapy to address this pain, but with little success. By July, Dr. Haffar began to treat her fibromyalgia with drugs after Akin reported "severe pain all over" as warm weather worsened her fibromyalgia symptoms. He prescribed gabapentin, tizanidine, ReQuip, and hydrocodone. When Akin returned to him twice over the next six months still complaining of frequent headaches, fibromyalgia, and chronic back pain, he renewed these prescriptions.

Two emergency-room visits in early 2012 for pain led to more assessments. During the first visit, in March 2012, Akin complained of back pain. The doctor who examined her noted that she had a normal gait, no spinal tenderness, and a full range of motion in her back and neck. The next day she saw Laurie Van Grinsven, a physician's assistant. Akin complained that her fibromyalgia had been getting worse and that her hands, hips, and toes ached. Van Grinsven renewed Akin's medications and sent her to a rheumatologist. The rheumatologist confirmed the fibromyalgia tender points and tenderness in her upper extremities. He noted, though, that Akin had a good grip, her hips moved well and were not tender, and she had a good range of motion in her axial skeleton.

Overall the rheumatologist concluded that Akin "is never going to feel well, but that [her] fibromyalgia is something that could be dealt with and managed."

Her second visit to the emergency room, in May, was also for pain. As happened at the first visit, the doctor who examined Akin noted that she had full range of motion in her neck and back, a normal gait, and good motor strength in her extremities. After her release Akin saw Dr. Haffar in July for ongoing back pain. Akin walked with a limp and still had trigger points in her back. Dr. Haffar prescribed Akin morphine. Two weeks later he wrote that Akin showed "mild neuropathy."

Akin had three more emergency-room visits over the next few months for new problems and her recurring pain. In late 2012, she went in for a bronchospasm. She was discharged the next day after her chest x-ray and CT scan showed no abnormalities in her lungs. During this one-day stay she did not complain about her fibromyalgia, and the doctor wrote that she had a full range of motion in her back and neck. But she returned to the emergency room in January 2013 complaining of renewed neck and back pain. Because her gait was at this time steady, she was sent home and told to rest. Akin had a follow-up appointment with Ms. Van Grinsven two weeks later. She observed that Akin moved slowly and shifted frequently, so she referred Akin for a chronic-pain evaluation. Akin went back to the emergency room for fibromyalgia pain two weeks later. Although she displayed a full range of motion, her movements were deliberate and slow. In between these visits, in November, Akin reported to Dr. Haffar increased pain from fibromyalgia and that she could not tolerate morphine, so he discontinued it.

During 2013, Akin received further observations for her pain. While wheelchair bound in March she visited Dr. Ryan Zantow, an orthopedist. He did not see any swelling in Akin's hands or weakness in her arms or legs. But he noted that Akin was hypersensitive to touch on her neck, shoulders, and upper back. The same month Akin had a follow-up visit with Ms. Van Grinsven, who observed that Akin was in moderate distress and moved slowly. She prescribed a short course of Percocet for Akin and referred her to a specialist in chronic pain. A month later she noted that Akin responded positively to the Percocet and renewed that prescription until Akin could see the pain specialist. At her visit with the pain specialist, Akin said that her pain ranged from a five to an eight on a ten-point scale and was a seven on average. She said that the pain interfered with her ability to walk, interact with others, perform household chores, and sleep. The specialist observed Akin walk with a normal gait and that she could walk on her toes and heels, but had tenderness in her neck and back. He wrote that Akin may benefit from injections in her back, but she declined that option.

Another emergency-room visit occurred after a dog jumped on her and aggravated her back pain in October 2013. The doctor wrote that Akin's motion in her neck and back was painful and that she had moderate pain across her back. After this visit she followed up with Ms. Van Grinsven and complained that her lower back pain had worsened over the past year. She had tenderness in her back and her range of motion was limited, but she walked with a normal gait. Ms. Van Grinsven renewed Akin's medications.

Two months later Akin saw Dr. Mauizio Albala for pain management. She said her pain ranged from a five to ten on a

ten-point scale. Dr. Albala wrote that Akin moved very slowly and had trouble with simple movements, and he noted that Akin needed help to stand up or sit down. He renewed Akin's prescriptions for gabapentin, tramadol, and Percocet, and he prescribed tizanidine and a fentanyl patch. A month later Akin reported a similar pain range to Dr. Albala and that it interfered with her daily activities. The doctor discussed injections for Akin's neck and back; she declined citing a concern about needles but said that she may need to reconsider. Akin followed up again in March, reporting similar pain that day, but acknowledged that on that day her pain was not as bad as it was the day of her last visit.

To diagnose and treat her ongoing and recurring pain, Akin received an MRI in March 2014. Carrie Voss, a nurse practitioner, assessed Akin as having "significant neck and low back pain as well as numbness, tingling and weakness in her upper and lower extremities." She renewed Akin's medications and scheduled the MRI scan. The results were illuminating. The MRI of Akin's lumbar spine showed "[m]oderate to severe spinal canal stenosis at T10-T11 secondary to ligamentum flavum hypertrophy" and a disk protrusion at L4-L5. Her neck showed a "[w]orsening disk herniation at C5-6 which causes moderate spinal stenosis and cord impingement." After the MRI, when Akin reported that her pain had not changed, Ms. Voss discussed injections with Akin. In May Akin reported no change in pain, but that with her regimen of fentanyl, gabapentin, tramadol, tizanidine, and oxycodone, she could at least complete her daily activities at home.

Two state-agency doctors reviewed some of Akin's records, but not the MRI results. Both opined that she was capable of sedentary work. First, in August 2012 Dr. Pat Chan

opined that Akin could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for 2 hours a day, and sit for 6 hours in a normal workday. The doctor credited some of her complaints of back pain, but said that her headaches were occasional, her March 2011 CT scan was normal, and that she could handle daily activities if given enough time to complete them. Second, Dr. Mina Khorshidi reviewed Akin's file in March 2013 (before Akin had the MRI scans), agreed with the limitations recommended by Dr. Chan, and also credited Akin's assertion that she has some pain from her impairments.

A hearing was held in June 2014 before an ALJ. In addition to receiving these records, the ALJ heard Akin testify about her pain. Her back pain is "stabbing and then throbbing" and persists until she relaxes or lies down. She experiences frequent headaches from neck pain. She can sit in a recliner for about an hour before needing to move, but otherwise she can sit only for a few minutes. She can stand for only a few minutes, cannot walk half a block, and needs to use a motorized cart in the grocery store. Her children help her do household chores, and she uses a chair to cook or clean. She wears hand braces to help with soreness in her hands. In response to the ALJ's questions about her treatment Akin said that her doctors wanted her to try injections in her back, but she wanted to wait until her kids were out of school before starting that treatment.

The ALJ concluded that Akin was not disabled because her "residual functional capacity" allowed her to perform "sedentary work." *See* 20 C.F.R. § 416.920(a)(4). In so ruling the ALJ credited the opinions of the two agency doctors, and

discounted those of Dr. Albala and Ms. Voss. The ALJ explained that Akin's statements about her symptoms were "not entirely credible" because doctors said that on some days she had a normal gait and good range of motion, could walk on her toes and heels, and had no swelling. Her reluctance to try injections, the ALJ thought, undermined the credibility of her allegations of disabling pain. The ALJ added that the MRI scans, which the agency physicians had not evaluated, were consistent with Akin's impairments, but the scans did not support her allegations of disabling pain.

After the appeals counsel denied review, a district judge upheld the ALJ's decision. The judge concluded that the ALJ did not rely on any impermissible factor to determine that Akin was not entirely credible.

We begin with Akin's strongest argument. Akin argues that the ALJ should not have credited the opinions of the state-agency physicians. She points out that they did not review about 70 pages of medical records, including the MRI results, that later became part of the record. And, Akin continues, the ALJ further erred by interpreting the MRI results himself.

We agree that the ALJ's evaluation of Akin's MRI results is flawed because the ALJ impermissibly "played doctor." *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). The ALJ stated that the MRI results were "consistent" with Akin's impairments and then based his assessment of her residual functional capacity "after considering … the recent MRIs." But, without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were "consistent" with his assessment. *See id.*; *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). The MRI results may

corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion. The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion. *See Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). But because the ALJ impermissibly interpreted the MRI results himself, we vacate the judgment and remand this case to the agency.

We comment briefly on Akin's other arguments. Akin also argues that the ALJ found her "not entirely credible." This is language that we have criticized repeatedly as "meaningless boilerplate." *See Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). We agree with Akin that the ALJ should revisit his credibility determination in at least three respects.

First, we are troubled by the ALJ's purported use of objective medical evidence to discredit Akin's complaints of disabling pain because fibromyalgia cannot be evaluated or ruled out by using objective tests. *See Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017). An "ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ should have developed a more fulsome record about Akin's testimony of pain before discounting it; a fuller record may have revealed evidence supporting or refuting Akin's claims.

Second, the ALJ also improperly discredited Akin because of her conservative course of treatment. The ALJ did not consider Akin's explanations for not seeking more aggressive treatments, as he was required to do. *See Beardsley v. Colvin*,

758 F.3d 834, 840 (7th Cir. 2014). Indeed Akin expressed that she was afraid of needles and that she wanted to wait until her children finished school before trying more invasive treatment. And, because Akin was responsible for her children, we do not think her need to ensure that her children would be cared for before scheduling more invasive medical procedures shows anything that undermines the legitimacy of her claim of disabling pain. *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).

Third, Akin persuasively argues that the ALJ did not properly evaluate her complaints of headaches. She argues that her March 2011 CT scan and other evidence show that her headaches were severe. The ALJ discounted Akin's complaints based on the opinions of the two state-agency consultants. But as we noted the ALJ will have the opportunity to request an updated medical opinion and reevaluate Akin's complaints of headaches.

Accordingly, we VACATE the judgment of the district court and REMAND the case to the agency for proceedings consistent with this opinion.