In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3729

KRYSTAL L. GOINS,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting Commissioner of
 Social Security

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 4057 — **Jeffrey N. Cole**, *Magistrate Judge.*

ARGUED AUGUST 5, 2014 — DECIDED AUGUST 19, 2014

Before BAUER, POSNER, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff filed suit in federal
district court seeking to overturn the denial of her applica-
tion for Supplemental Security Income, a disability benefit
for poor people. The Social Security Administration's admin-
istrative law judge who adjudicated her claim found both
that she was not a credible witness and (relatedly) that med-
ical evidence did not support her testimony that she suffered

from acute pain as a result of having a herniated spinal disc (colloquially a "slipped disc"). The district court affirmed the denial of benefits, precipitating this appeal.

An MRI had revealed the herniated disc back in 1998. The medical record is blank from then until 2007, when the plaintiff complained to an emergency room physician that she had been suffering from lower-back pain for several days. She mentioned the herniated disc, and was prescribed Vicodin. Almost a year later, shortly before she filed her application with the Social Security Administration, she was examined by an anesthesiologist who specializes in pain management, to whom the plaintiff's primary-care physician had referred her. She told the anesthesiologist that she was experiencing "burning and shooting" pain radiating from her lower back to her legs and through her legs to her feet; that on a scale of 0 to 10 the pain ranged from 5 to 10; that it was "continuous day and night"; and that it was aggravated by changes in position and by periods of standing, sitting, or walking. The anesthesiologist noted the plaintiff's "slow, guarded gait," and in part on the basis of the 1998 MRI diagnosed three conditions: the slipped disc, radiculopathy (a pinched nerve in the spine), and myofascial pain (a chronic pain disorder caused by repetitive motions or by muscle tension induced by stress). In both this and a subsequent visit by her, the anesthesiologist prescribed Lyrica, a common pain-treatment drug. The plaintiff testified in the administrative proceeding that her pain, combined with the drowsiness induced by the pain medication, limited her daily activities to eating, caring for her dogs, taking naps, and watching television. The anesthesiologist opined that the plaintiff was "unable to work" because of "lumbar disc protrusion."

Another anesthesiologist, a consultant to a state agency that assists the Social Security Administration in disability cases, interviewed (but apparently did not examine) the plaintiff, reviewed her medical records, and concluded that she was able to work full time. He noted the diagnoses of lumber disk herniation, lumbar radiculopathy, and myofascial plain, as well as the SSA field officer's observation that "she had a hard time sitting in the chair during the interview," but without questioning the diagnoses or the field officer's observation the consulting physician concluded that the plaintiff can lift objects weighing 50 pounds for a third of the workday and even can "crouch" and "crawl." But he left blank the section of the form on which he presented his conclusions that asked him to identify the evidence supporting them. This was an important omission because his conclusions were in tension with the diagnoses that he did not question and with the plaintiff's obesity, which he could not have failed to notice. He stated on the form, again without explanation, that the medical evidence "partially" supported the plaintiff's allegations. The report, in short, is a mess.

Another state-agency consulting physician, a pediatrician, reviewed the same medical record that the first consulting physician had reviewed, and endorsed that physician's conclusions. His report is only half a page long, and extremely unclear. He was aware that the plaintiff had complained that her condition had worsened beginning in 2009, but because there was no medical evidence in the plaintiff's application file he concluded illogically that this "called into question the severity of the [plaintiff's] allegations." Like the first physician, he did not examine the plaintiff.

We note the oddity of inviting a pediatrician to opine on the medical condition of a 28-year-old woman (the plaintiff's age when the pediatrician offered his opinion)—and likewise the oddity of asking anesthesiologists to evaluate spinal-cord problems. In fairness, we note that one of the anesthesiologists was a specialist in pain management, but the plaintiff's medical problems are not limited to pain.

In late 2009 and early 2010, while her application (filed the previous year) for Supplemental Security Income was pending, the plaintiff sought treatment for her back problem. She received little treatment but did have an MRI in 2010 (the first in eleven years), which revealed degenerative disc disease, stenosis (a narrowing of the spinal canal), and a "Chiari I" malformation, which is a condition in which brain tissue extends into the spinal canal.

At the evidentiary hearing conducted by the administrative law judge, which took place in the fall of 2010, the plaintiff testified that she had quit the last job she had had, working in a hospital cafeteria, in 2008 because it had been too strenuous for her. She testified that her pain and numbness were getting worse, and she speculated that they were being aggravated by her migraine headaches, panic attacks, bronchitis, pain medications, and obesity. She testified that she is five foot six inches tall and weighs 250 pounds and is physically nearly inactive and can't even sit watching an hour-long television show because of pain—although she does watch cooking shows. She rated her pain as 8.5 on a scale of 1 to 10.

Much of her testimony, for example about how physically inactive she had become, was uncorroborated. That was not in itself a reason to think she was exaggerating her con-

dition. The reasons the administrative law judge gave for finding that she was exaggerating were unsound.

The main reasons were four. The first was that the plaintiff had worked in the cafeteria for almost six months, ending in November 2008, a year after the alleged onset of her disability. But she testified that her condition had worsened since. And the fact that someone works is not a sufficient ground for concluding that she's not disabled. We have explained that "even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012); see also *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004); *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998). This is especially likely when the work is part time—as was the plaintiff's work in the cafeteria.

The second reason was that she had not sought frequent medical treatment. The administrative law judge noted that she had no health insurance, but thought that at least she might have been expected to visit a hospital emergency room more frequently than she had done. The administrative law judge overlooked the fact that hospitals charge very high prices for emergency room services for non-emergency conditions, are assiduous in trying to collect those charges, and "are required to treat an indigent only if the indigent is experiencing a medical emergency." *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). The plaintiff in this case appears to be indigent. Remember that she applied for Supplemental Security Income, which is a disability benefit available only to persons who have no more than $2000 in cash or the

equivalent. If she had had more, her application would have been denied without need to obtain any medical evidence.

The third reason was the administrative law judge's uncritical acceptance of the consulting physicians' conclusions. They had not examined the plaintiff. They had been vague about the medical evidence that they thought supported their conclusions. Most important, they had not been shown the report of the 2010 MRI. Fatally, the administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence. *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000); *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001); *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997); *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992). That evidence undermined the reasoning of the second consulting physician, whose ground for disregarding the plaintiff's allegation that her condition had worsened was the lack of new supporting medical evidence in the file. Instead, playing doctor (a clear no-no, as we've noted on numerous occasions; see, e.g., *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)), the administrative law judge summarized the results of the 2010 MRI in barely intelligible medical mumbo-jumbo, noting that it revealed degenerative disc disease and stenosis while ignoring the Chiari I malformation.

The summary stands by itself in her opinion, unrelated to anything else. She made no effort to compare the 2010 MRI with the earlier one, and she did not use the report of the results of that MRI as an aid to evaluating the plaintiff's testimony. In fact the 2010 MRI shows a worsening of the plaintiff's spinal problems compared to the results of the 1998

MRI—the only MRI report on which the two consulting physicians relied in questioning the gravity of her condition. The earlier MRI had revealed degenerative disease in only one disc, while the later MRI showed degeneration all along the cervical and lumbar regions of the spine. (The cervical vertebrae are just below the head and the lumbar vertebrae are in the lower back.)

Furthermore, in disbelieving that the plaintiff has migraine headaches, the administrative law judge overlooked the fact that a Chiari I malformation, visible in the 2010 MRI but not the 1998 one, can cause severe headaches—indeed headaches are the "classic symptom of Chiari malformation." Mayo Clinic, "Chiari Malformation: Symptoms," www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/symptoms/con-20031115 (visited Aug. 9, 2014). Cf. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

The statement by the magistrate judge in this case, in upholding the denial of benefits, that "while it is true that the ALJ did not specifically mention Chiari malformation, she was not required to recite each of [the plaintiff's] diagnoses," amounts to saying that an administrative law judge is free to ignore medical problems that may be causing the symptoms the claimant is alleging. Having a part of one's brain lodged in one's spine is not the equivalent of having a runny nose or an ingrown toenail. The presence of a Chiari I malformation, as we noted, supports the plaintiff's claim to experience serious headaches.

The administrative law judge gave meager attention to the plaintiff's obesity, on the ground that "the record does not support an inability to ambulate effectively." We keep telling the Social Security Administration's administrative

law judges that they have to consider an applicant's medical problems in combination. *Yurt v. Colvin*, 2014 WL 3362455, at *9 (7th Cir. July 10, 2014); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); see also *Gentry v. Commissioner of Social Security*, 741 F.3d 708, 726 (6th Cir. 2014); *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Macri v. Chater*, 93 F.3d 540, 545 (9th Cir. 1996). Like most obese people, the plaintiff can walk. Her obesity is not disabling in itself. But it is an added handicap for someone who has degenerative disc disease, a narrowed spinal canal, bronchitis, and a Chiari I malformation. Pain and numbness in the legs caused by spinal disease are bound to be aggravated by obesity. The administrative law judge may also have misstated the plaintiff's weight, saying she weighs 220 pounds, which would give her a BMI of "only" 35.5. But remember that the plaintiff testified that she weighs 250 pounds. That would give her a BMI of 40.3, making her not merely obese (BMI > 30), but morbidly so (BMI > 40). Progress notes from her SSA file indicate that her weight ranged from 236 to 240 between February and July 2008, implying a BMI of between 38.1 and 38.7—close to morbidly obese. Yet the 220-pound figure seems to date from the same year, 2008, which was when she applied for disability benefits. The administrative law judge should have arranged for her to be weighed shortly before the hearing.

The neglect of the plaintiff's obesity is one factor, though not the only one, in the administrative law judge's unsupported conclusion regarding the plaintiff's ability to work. The opinion repeats the oft-criticized (see, e.g., *Bjornson v. Astrue*, 671 F.3d 640, 644–46 (7th Cir. 2012)) boilerplate that although "the claimant's medically determinable impair-

ments could reasonably be expected to cause the alleged symptoms … , the claimant's statements … are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The implication is that the assessment (of the claimant's residual functional capacity—that is, ability to work) precedes and may invalidate the claimant's testimony about his or her ability to work. Actually that testimony should be an input into a determination of ability to work. It seems that the administrative law judge improperly and irrevocably decided, on the basis of the inadequate reports of the two consulting physicians, that the plaintiff was capable of full-time work, and having made that decision naturally had to brush aside the plaintiff's testimony, including her testimony about the difficulty she has in walking and in standing as a result of her obesity. The consulting physicians hadn't mentioned obesity; for all we know, had they been asked how her obesity affected her ability to work their bottom-line evaluation would have been that she can't work.

A further problem with the boilerplate passage is that if the plaintiff's "*medically determinable* impairments could reasonably be expected to cause the alleged symptoms" (emphasis added), why is the plaintiff's credibility important? No one doubts the accuracy of the 2010 MRI, or that the plaintiff is obese, or that the spinal conditions revealed by that MRI are grave. Even the administrative law judge did not deny these things, which is an additional reason to doubt the validity of her denial of benefits.

The plaintiff's residual functional capacity as determined by the administrative law judge included the ability to do jobs that involve lifting 50-pound objects for a third of an

eight-hour workday and 25-pound objects for the other two-thirds, implying capacity to hold a job in which the worker is standing throughout the entire workday. Inconsistently, the administrative law judge also determined that the plaintiff's residual functional capacity is limited to standing or walking for six hours in an eight-hour workday. How she could be thought capable of either standing or walking for six out of eight hours eludes us. Given her obesity and the serious spinal problems revealed by the 2010 MRI, we can't understand how the administrative law judge could have concluded that the plaintiff has a capacity for such hard physical labor.

If we thought the Social Security Administration and its lawyers had a sense of humor, we would think it a joke for its lawyer to have said in its brief that the administrative law judge "accommodated [the plaintiff's] obesity by providing that she could never [be required as part of her work duties to] climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs, balance, kneel, crawl, stoop, and/or crouch." (The administrative law judge must have forgotten that the primary consulting physician thought the plaintiff *can* crawl and crouch at work.) Does the SSA think that if only the plaintiff were thin, she could climb ropes? And that at her present weight and with her present symptoms she can, even occasionally, crawl, stoop, and crouch?

The administrative law judge's critical failure, however, was the failure to obtain a medical report on the results of the 2010 MRI.

The plaintiff deserves a more careful evaluation than she has received to date. The judgment of the district court is reversed with instructions to remand the case to the Social Security Administration.